Grace Jun, Esq., SBN 287973
grace@gracejunlaw.com
**Grace Jun Law**
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 841-1408

Danielle R. Pena, Esq., SBN 286002
dpena@PHGLawGroup.com
**PHG Law Group**
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 826-8060

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF COREY DEAN, CAROLYN DEAN, and MICHAEL DEAN, as co-successors in interest to Decedent COREY DEAN, and in their own individual right,

                Plaintiffs,

v.

COUNTY OF SAN DIEGO; PAMELA MITCHELL-ROGERS, in her individual capacity; ANGELA BUENO, in her individual capacity; HOSANNA ALTO, in her individual capacity; KIMBERLY MILLER, in her individual capacity; HALSEY MENENDEZ, in her individual capacity; JASMINE ANGEL, in her individual capacity; MISTY BACCELIA OR SANDRA EMEKOBA, in her individual capacity; NAPHCARE, INC.; NAPHCARE OF SAN DIEGO, LLC; CORRECTIONAL HEALTHCARE PARTNERS; and DOES 1-30,

                Defendants.

CASE NO.    '25 CV 3860 GPC DDL

# COMPLAINT

1) **Pretrial Detainee's Claim re: Conditions of Confinement and/or Medical Care (42 U.S.C. §1983)**
2) **Deprivation of Right of Association (42 U.S.C. § 1983)**
3) ***Monell* municipal liability (42 U.S.C. § 1983)**
4) **Violation of Americans with Disabilities Act**
5) **Violation of Rehabilitation Act**
6) **Violation of California's Bane Act (Civil Code 52.1)**
7) **Negligence**
8) **Wrongful Death**

**JURY TRIAL DEMANDED**

COMES NOW Decedent COREY DEAN, by and through his co-successors in interest CAROLYN DEAN and MICHAEL DEAN, and CAROLYN DEAN and MICHAEL DEAN in their own individual right, to allege and complain as follows:

## I. INTRODUCTION

1.      This matter is about the tragic and preventable in-custody death of Corey Michael Dean ("Mr. Dean" or "Corey"). Mr. Dean was incarcerated at Vista Detention Facility on June 15, 2025. Upon intake, medical staff acknowledged that Mr. Dean suffered from psychotic disorders, including schizophrenia, and had a history of mental health treatment during prior incarcerations. Despite this, Mr. Dean was not evaluated for treatment and not placed in housing designated for seriously mentally ill people.



2.      Rather, Mr. Dean was treated as any other inmate and housed in general population without first undergoing a psychiatric assessment. Without adequate medication and psychiatric care, Mr. Dean decompensated and became erratic and unpredictable. When Mr. Dean started screaming, crying, and acting bizarrely, deputies placed Mr. Dean in solitary confinement on June 28, 2025.

3.      While housed in solitary confinement, Mr. Dean was evaluated by multiple medical and mental health providers. Each provider acknowledged Mr. Dean's psychotic disorder and bizarre behavior. For instance, mental health providers observed "severe mental illness w/ bizarre [behaviors] (e.g., yelling, urinating on the door, and unkept cell)." They documented that Mr. Dean was disorganized, disheveled, with nonlinear thought process and delusional thought content. One provider even acknowledged that Mr. Dean required assistance for

1) comprehension, 2) self-care, 3) communication, and social skills—indicating that Mr. Dean was gravely disabled. Medical providers also knew that on June 30, 2025, the court suspended all criminal hearings and ordered a competency review under Penal Code 1368. Despite this knowledge, and with an acute understanding that Mr. Dean was decompensating in solitary confinement, multiple mental health providers chose to keep Mr. Dean in solitary confinement, without access to meaningful psychiatric treatment and monitoring.

4.    The last two weeks of Mr. Dean's life were spent in isolation. In San Diego County jails, solitary confinement means a cell smaller than a compact-sized parking space for 23 hours a day. According to inmate witnesses housed near Mr. Dean, Mr. Dean screamed, cried, and begged for help and medical assistance. He told deputies that he had a fever, was vomiting, and in pain. Mr. Dean told other concerned inmates that he was urinating on himself to keep warm. Witnesses claimed Mr. Dean pushed the intercom button daily. His pleas went ignored.

5.    Mr. Dean would flood his cell with blackwater and smeared feces on himself in order to gain the attention of deputies. These efforts had the opposite effect as deputies not only continued to ignore Mr. Dean, but they placed blankets and towels at the base of the cell door to keep the blackwater from seeping out to the module. Deputies intentionally left Mr. Dean in the contaminated cell for over two weeks, exposing Mr. Dean to an increasing likelihood of infection and continued mental distress.

6.    On July 12, 2025, the day before Mr. Dean's death, he screamed and cried all day stating he could not see and wasn't feeling well. According to one inmate, Mr. Dean pushed the intercom bottom throughout the day. Each plea for help went ignored. Even pleas from other inmates were ignored.

7.     That night, when medical staff administered medication, Mr. Dean told the medical provider that he wasn't feeling well and that he could not see. The medical provider heard Mr. Dean but did not provide or summon medical care.

8.     Hours later, at approximately 3:00 am on July 13, 2025, Deputies discovered Mr. Dean dead. Based on the level of rigor mortis present, Mr. Dean had been dead for hours before they discovered him. According to witnesses, Mr. Dean's body was blue and stiff. Mr. Dean's lower body was on the bunk and his upper body was hanging off the bunk. His arms were spread out, and his head was touching the floor. Deputies dragged Mr. Dean's body, which was lying on top of a feces and urine covered mattress, into the module. Mr. Dean was pronounced dead soon thereafter. Deputies left his body on the soiled mattress in the module for hours, forcing other inmates to eat breakfast while staring at Mr. Dean's dead body and soiled mattress.

9.     Mental health experts universally advise that inmates with serious mental illness housed in solitary confinement are vulnerable to deterioration and decompensation of their mental health condition. Placing such individuals in isolation intensifies their symptoms and puts them at substantial risk of psychosis and further decompensation. The National Commission on Correctional Health Care ("NCCHC") issued a position statement observing that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health." The NCCHC observes that "[i]t is well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement," and that "segregation can exacerbate preexisting conditions." California Attorney General Rob Bonta contends that placing people with serious mental illness in restrictive segregation units is contraindicated for their health and safety subjects[ing] them "to a substantial risk of serious harm or death."

10.     Accordingly, as detailed below, by way of Grand Jury reports, watchdog group reports, the NCCHC report, the State Auditor's report, and at least half-a-dozen lawsuits, including the *Dunsmore* class action, the County is acutely aware of the risks of housing seriously mentally ill inmates in solitary confinement. However, by policy and practice, the County routinely confines people with serious mental illnesses in solitary confinement. In fact, based on information and belief, the County, houses inmates with serious mental illness in solitary confinement *because* of their mental illness.

11.     Dr. Pablo Stewart is a psychiatrist and correctional health expert who has been retained by the plaintiffs in in the *Dunsmore* class action case against the Sheriff's Department currently pending in the Southern District of California (case no. 20-cv-00406-AJB-DDL). Dr. Stewart testified before the three-judge panel in the consolidated matters of *Coleman v. Brown* and *Plata v. Brown* related to overcrowding in California prisons. In *Brown v. Plata*, 563 U.S. 493 (2011), the Supreme Court upheld the decision of the three-judge panel ordering reductions in California's prison population and cited Dr. Stewart's work.

12.     In 2023 and 2024, Dr. Stewart toured the administrative separation housing units at San Diego County jails and reviewed the confinement conditions for numerous inmates in Ad-Sep.[1] In one subheading in his expert report, Dr. Stewart wrote "Conditions in San Diego County Jail's Administrative Separation Units Constitute Some of the Harshest, Most Restrictive Forms of Solitary Confinement I Have Ever Witnessed in a Jail System."

13.     Dr. Stewart also reviewed Mr. Dean's care as part of his work in the *Dunsmore* class action case. He wrote as follows regarding Mr. Dean:

> Corey Dean, a 43-year-old patient with a known history of psychotic disorders and mood disorders, died on July 13, 2025 in an

[1] In San Diego County jails solitary confinement is called "Administrative Separation" or "Ad-Sep."

Administrative Separation unit at the Vista Detention Facility. Mr. Dean's medical records indicate that, throughout his 28-day incarceration, he was increasingly psychotic and unable to conduct meaningful self-care activities. Although deputies and medical and mental health staff at the Jail were aware that he was in distress and knew that he required a higher level of care, he was seen just once by psychiatric staff, even as that staff noted that he needed to be seen more often given his mental health condition. As indicated below, Mr. Dean should have been seen by a psychiatrist within a week of being prescribed a psychiatric medication. Once it was clear that the prescribed medication was not working, Mr. Dean should have received additional care, and certainly should have been removed from the Administrative Separation unit. Mr. Dean's death represents an egregious case of neglect.

14.    For these reasons,[2] Mr. Dean's parents, CAROLYN DEAN and MICHAEL DEAN, bring this suit against the County of San Diego, and its correctional and medical staff, based on their apathy and neglect of Mr. Dean and their refusal to properly treat and house seriously mentally ill inmates.

## II. JURISDICTIONAL ALLEGATIONS

15.    Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4), et. seq.

16.    Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego California, within the Southern District

17.    At all times relevant to this complaint, decedent Mr. Dean was an individual residing in Fallbrook, California. The misconduct resulting in Mr. Dean's death, occurred in San Diego County.

---

[2] As of the date of this filing, the autopsy is not available. Therefore, Plaintiffs are ignorant of Mr. Dean's exact cause of death. However, as alleged, Mr. Dean died as a result of the neglect on behalf of deputies, mental health staff, the County, Naphcare, and CHP.

6
COMPLAINT

18.    At the time of his death, Mr. Dean was not married.  He had no children.  He did not leave behind any will or other testamentary document.  Mr. Dean died intestate.  For this reason, there is no probate proceeding pending related to Mr. Dean. As his surviving parents, Carolyn Dean and Michael Dean are Mr. Dean's heir and beneficiary. There is no other person with a superior right to commence the action. *See* Cal. Civ. Proc. Code § 377.30. Thus, Carolyn Dean and Michael Dean are co-successors-in-interest. The declarations of Carolyn Dean and Michael Dean as co-successors-in-interest are filed concurrently with this complaint.

19.    Decedent Mr. Dean, by and through his co-successors-in-interest, and Plaintiffs Carolyn Dean and Michael Dean have properly complied with the Government Claim Act.  Their claims were submitted to the County of San Diego on October 2, 2025. The County has not responded to Plaintiffs' claims. Pursuant to California Government Code § 912.4, if the County fails or refuses to act within 45 days, the claims are deemed rejected by operation of law. Accordingly, the claims were deemed rejected on November 16, 2025.  Thus, the present complaint is timely, pursuant to California Government Code section 945.6.

## III.  PARTIES

20.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

21.    Defendant County of San Diego is a public entity, duly organized and existing under the law of the State of California. The San Diego County Sheriff's Department is an agency operating under the County of San Diego's authority.  The Sheriff's Department owns, operates, and manages the Vista Detention Facility ("VDF") and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions of its staff members, employees, agents, and contractors of VDF. The County is also responsible for

7
COMPLAINT

developing, implementing, and amending jail medical policies, procedures, and training.  The County has a non-delegable duty to provide adequate medical care and cannot contract out that obligation to third-party medical groups.

22.    At all times relevant to this complaint, Naphcare, Inc. and/or Naphcare of San Diego, LLC, (collectively, "Naphcare") was the third-party contractor responsible for providing medical and mental health services to inmates in the custody of the San Diego County Sheriff's Department who may have employed, supervised, and/or trained certain individual defendants in this case. Naphcare was also responsible for generating, implementing, and maintaining medical and mental health policies and protocols.

23.    At all times relevant to this complaint, Correctional Healthcare Partners (CHP) was the other third-party contractor responsible for providing medical services to inmates in the custody of the San Diego County Sheriff's Department. CHP may have employed, supervised, and/or trained certain individual defendants in this case.

24.    At all times relevant to this complaint, Defendant Pamela Mitchell-Rogers worked at VDF. Rogers was responsible for providing Mr. Dean mental healthcare services. Defendant acted under color of state law at all times relevant to this Complaint.  Defendant Rogers' deliberate indifference occurred in the County of San Diego.

25.    At all times relevant to this complaint, Defendant Angela Bueno worked at VDF. Bueno was responsible for providing Mr. Dean mental healthcare services. Defendant was working under the color of state law at all times relevant to this Complaint.  Defendant Bueno's deliberate indifference occurred in the County of San Diego.

26.    At all times relevant to this complaint, Defendant Hosanna Alto worked at VDF. Alto was responsible for providing Mr. Dean mental healthcare services. Defendant was working under the color of state law at all times relevant

to this Complaint.  Defendant Alto's deliberate indifference occurred in the County of San Diego.

27.    At all times relevant to this complaint, Defendant Kimberly Miller worked at VDF. Miller was responsible for providing Mr. Dean mental healthcare services. Defendant was working under the color of state law at all times relevant to this Complaint.  Defendant Miller's deliberate indifference occurred in the County of San Diego.

28.    At all times relevant to this complaint, Defendant Halsey Menendez worked at VDF. Menendez was responsible for providing Mr. Dean mental healthcare services. Defendant was working under the color of state law at all times relevant to this Complaint.  Defendant Menendez's deliberate indifference occurred in the County of San Diego.

29.    At all times relevant to this complaint, Defendant Jasmine Angel worked at VDF. Angel was responsible for providing Mr. Dean mental healthcare services. Defendant was working under the color of state law at all times relevant to this Complaint.  Defendant Angel's deliberate indifference occurred in the County of San Diego.

30.    At all times relevant to this complaint, Defendant Misty Baccelia  _or_ Defendant Sandra Emekoba worked at VDF. Baccelia _or_ Emekoba was responsible for providing Mr. Dean medication on July 12, 2025. Defendant was working under the color of state law at all times relevant to this Complaint. Defendant's deliberate indifference occurred in the County of San Diego.

31.    Defendant DOES 1-19 were housing deputies assigned to Ad-Sep House E at VDF from June 28, 2025 through July 13, 2025.  At all times relevant to this complaint, DOES 1-19 were employed by the County and were responsible for the safety and wellbeing of inmates, including Mr. Dean, residing in Ad-Sep House E at the Vista Detention Facility. DOES 1-19 were also responsible for conducting hourly safety checks on Mr. Dean and monitoring him for signs of

medical distress or trauma. DOES 1-19 were required to summon medical care if an inmate requests medical assistance or if the deputy observes obvious signs of medical distress. DOES 1-19 also ignored Mr. Dean's repeated pleas for medical assistance and ignored the requests of other inmates within House E who observed Mr. Dean in distress and attempted to summon aid for Mr. Dean.

32.    At all times relevant to this complaint Defendant DOE 20 was the classification deputy responsible for housing Mr. Dean in Ad-Sep on or around June 28, 2025 and for keeping Mr. Dean in Ad-Sep. This Defendant was on notice that the unconstitutional practice of housing inmate's with serious mental illness in Ad-Sep did not align with correctional healthcare standards and was directly resulting in preventable deaths.

33.    DOE 21 is the charge nurse that was advised of Mr. Dean's worsening symptoms and further decompensation. DOE 21 was responsible for ensuring that Mr. Dean received meaningful mental health treatment, medication management, and proper a housing placement. DOE 21 was responsible for ensuring Mr. Dean was urgently assessed or sent out to a higher level of care.

34.    DOE 22 was the psychiatric provider that was responsible for performing the required psychiatric follow-up evaluation and assessment of Mr. Dean. DOE 22 was responsible for conducting the assessment as scheduled and to ensure that Mr. Dean's medication management was adequate and effective. DOE 22, however, never conducted this required evaluation of Mr. Dean before Mr. Dean's death.

35.    DOES 23-24 were other medical providers that were responsible for Mr. Dean's medical and mental health care and were acutely familiar with Mr. Dean's clinical presentation and treatment needs. DOES 23-24 were responsible for ensuring that Mr. Dean received meaningful mental health treatment, medication management, and a proper housing placement. DOES 23-24 was

responsible for ensuring Mr. Dean was urgently assessed or sent out to a higher level of care.

36.    Defendants 25-30 are the supervisory officials that were on notice of the County's unconstitutional practice of housing inmate's with serious mental illness in Ad-Sep. These Defendants were on notice that the unconstitutional practice did not align with correctional healthcare standards and was directly resulting in preventable deaths. These Defendants failed to modify or implement adequate policies and practices knowing that such a failure would result in preventable deaths.

37.    Defendants DOES 1-30, inclusive, are persons whose identities, titles, and employment/agency relationships are currently unknown to Plaintiffs; that is, they are currently ignorant of the true names of these persons.  As detailed above, these DOE defendants include jail staff, detention officers, JPMU ("classification") officers, medical staff, medical providers, mental health staff, mental health providers, supervisors, employees, agents, contractors, and final policymakers who substantially contributed to the acts and omissions giving rise to the damages claimed herein.

38.    These DOE defendants each acted under color of state law, within the scope of their agency and/or employment, and with the full knowledge and consent, either express or implied, of their principal and/or employer.  Plaintiffs will seek leave to substitute the true names of these defendants when they learn their true identities.

39.    Plaintiffs name Defendant DOES 1-30 for the purposes of allowing "relation back" under Fed. R. Civ. P. 15(c)(1)(A). The Advisory Committee Notes to the 1991 amendment to Rule 15(c) states that a new subdivision (currently Rule 15(c)(1)(A)) was added "to make it clear that the rule does not apply to preclude any relation back that may be permitted under the applicable limitations law."  If the forum state law "affords a more forgiving principle of relation back

than the one provided in this rule, it should be available to save the claim." *Id*. Plaintiff's reference to Defendant "Does" in their complaint is made to allow relation back to the filing date of the original complaint if an amended complaint is submitted after the expiration of the statute of limitations. To avail themselves of California's more liberal relation back rule under Rule 15(c)(1)(A) under *Butler v. Nat'l Cmty. Renaissance of California*, 766 F.3d 1191, 1201 (9th Cir. 2014), Plaintiffs must plead the existence of DOE Defendants under California's fictitious name statute, Code Civ. Proc. § 474. If Plaintiff does not plead "Does" they will be precluded under Code Civ. Proc. § 474 from relating back any claims. *See Audrey G. v. City of Lafayette*, No. 21-CV-03545-WHO, 2022 WL 16528143, at *7 (N.D. Cal. Oct. 28, 2022) (finding that California's relation back standard governed under Fed. R. Civ. P. 15(c)(1) but holding plaintiff failed to meet California's standard by failing to name fictitious Doe defendants).

## IV.    FACTUAL ALLEGATIONS OF THE COMPLAINT

40.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

**A. The Death of Michael Corey Dean**

41.    On June 15, 2025, during Mr. Dean's intake screening, the nurse noted that Mr. Dean suffered from a psychotic condition and had a history of mood disorders. Based on that, the nurse referred Mr. Dean to a psychiatric sick call appointment.

42.    After the intake screening, Mr. Dean was not housed in psychiatric housing. Rather, Mr. Dean was housed in general population housing.

43.    While in general population housing, Mr. Dean yelled and screamed for days, pleading for help and medical attention. Mr. Dean banged on the cell door, vent and table, trying to gain the attention of the housing deputies. When those pleas for help went ignored, Mr. Dean flooded his cell with dirty toilet

water and smeared feces across his face and body to gain the housing deputies' attention.

44.    As a result of this psychotic behavior, a chart review was prompted on June 16, 2025, which was conducted by Defendant Pamela Mitchel-Rogers. A chart check consists of reviewing the inmate's prior medical records and previous in-custody treatment. This chart review was performed remotely. Defendant Rogers had no contact with Mr. Dean during this chart review. Defendant Rogers noted that Mr. Dean was displaying bizarre behavior, such as flushing trash down the toilet and urinating outside of his cell. Based on information and belief, Defendant Rogers did not adequately review Mr. Dean's prior medical records that existed within the Sheriff's Department's electronic medical record keeping system. Had she done so, she would have recognized that Mr. Dean had a history of psychotic disorders and required medication, daily clinical monitoring, and specialized housing due to his psychotic disorder and inability to care for himself. Other than noting that Mr. Dean had a mental health appointment pre-scheduled on June 20, 2025, Defendant Rogers took no action, made no referrals for treatment or housing, did not review or summarize Mr. Dean's lengthy mental health history, and failed to have Mr. Dean evaluated on an urgent basis.

45.    On June 19, 2025, a mental health evaluation was conducted by Defendant Angela Bueno due to housing deputies who continued to observe and report bizarre behavior by Mr. Dean. Defendant Bueno noted that Mr. Dean suffered from psychotic and mood disorders. Defendant Bueno further noted that Mr. Dean was disheveled and malodorous. Defendant Bueno observed that Mr. Dean's cell was filled with empty food wrappers and had towels covering the opening of the cell to catch the urine that was seeping out of the door. Defendant Bueno noted Mr. Dean was disorganized and delusional. She also noted that Mr. Dean's insight and judgment was "poor." Other than securing Mr. Dean's agreement to "ask for help should mental health symptoms or suicidal thoughts

occur," Defendant Bueno's plan was to have "the [Mr. Dean] engage in counseling and seek resources for stabilizing areas of his life." However, Defendant Bueno did not order counseling or schedule a follow-up assessment. Defendant Bueno did not order an urgent psychiatric evaluation to determine if Mr. Dean needed anti-psychotic medication, nor did Defendant Bueno order Mr. Dean be housed in psychiatric housing that would provide constant monitoring and treatment options. Stated plainly, Defendant Bueno took no action, made no referrals, and failed to have Mr. Dean evaluated on an urgent basis for medication management or housing placement.

46.    On June 22, 2025, another wellness exam was performed by Defendant Hosanna Alto, a Mental Health Clinician ("MHC.") This exam was performed cell side in general population housing. Defendant Alto noted there was an intense urine odor coming from Mr. Dean's cell. Defendant Alto noticed a blanket on the floor to seep up blackwater that was coming out of the cell. Alto noted there were "many flies" inside and outside the cell. Defendant Alto further noted that Mr. Dean was psychotic, anxious, and irritated. She found Mr. Dean to be disheveled, uncooperative, paranoid, illogical, incoherent, and disorganized. Defendant Alto noted Mr. Dean was difficult to assess "due to increased level of agitation." Defendant Alto diagnosed Mr. Dean with schizoaffective disorder.

47.    Defendant Alto determined that Mr. Dean required assistance with 1) comprehension, 2) self-care, 3) communication, and 4) social skills. This determination should have resulted in a psychiatric housing order, such as a placement in the Psychiatric Security Unit (PSU), which is located at the Central Jail. The PSU is a Lanterman Petris Short (LPS) facility. Gravely disabled individuals such as Mr. Dean must be housed in the PSU according to the County's own policy.

48.    Despite Defendant Alto's finding that Mr. Dean was psychotic and gravely disabled, Defendant Alto failed to properly treat, medicate, or house Mr.

Dean. Like the previous providers, Defendant Alto took no action, made no referrals, and failed to have Mr. Dean evaluated on an urgent basis for medication management and housing placement.

49.    Later that same day at 1:17 pm, Mr. Dean received his first and only psychiatric evaluation performed by Defendant Kimberly Miller, a nurse practitioner. The evaluation was scheduled as a result of the initial intake screening. The evaluation occurred at cell-side, with a deputy present and other inmates within earshot. Defendant Miller noted that Mr. Dean was disheveled, visibly dirty, and malodorous. She also noted "strong urine coming from cell, towels on floor outside of cell." Defendant Miller further noted that Mr. Dean was disorganized, off topic, grandiose and delusional.

50.    Defendant Miller assessed Mr. Dean as having an unspecified psychotic disorder, including schizoaffective disorder, and prescribed 5 mg of Zyprexa to be taken twice per day, and scheduled a follow-up psych appointment "in 2 weeks unless sooner visit is warranted."

51.    Zyprexa is an antipsychotic medication. Dr. Stewart, the psychiatric expert in the *Dunsmore* class action matter, wrote as follows regarding this interaction:

> The Jail's failure to conduct a clinically indicated and clinically ordered follow-up appointment is extremely concerning and falls below the standard of care. In general, after prescribing a new psychiatric medication or a new dosage of an existing psychiatric medication, a practitioner should follow up with the patient after one week. Failing to conduct a psychiatric follow-up appointment with Mr. Dean **at all** after prescribing new medication violates the standard of care.

52.    While Defendant Miller prescribed a new anti-psychotic medication, she failed to order a timely follow-up evaluation which is the standard of care for medication management. Defendant Miller also failed to order continued mental health monitoring or counseling. Defendant Miller further failed to consider or

15
COMPLAINT

order psychiatric housing that would provide constant monitoring and treatment options, as clinically indicated, and order Mr. Dean to a higher level of care.

53.    Defendant Miller ordered that a follow up psychiatric appointment occur in two (2) weeks for Mr. Dean. Yet, no further psychiatric evaluation ever occurred before Mr. Dean's death.

54.    The failure to conduct a psychiatric follow-up appointment is even more concerning given the obvious indications that Mr. Dean was not improving on the prescribed dose of Zyprexa. Mr. Dean's medical records indicate that he was relatively medication compliant, with a compliance rate of 76%. Yet, there are multiple notes stating that Mr. Dean's condition was not improving, with alarming symptoms that indicated serious mental health and medical concerns.

55.    For instance, notes in the record include: "reports of severe mental illness w/ bizarre [behaviors] (e.g., yelling, urinating on the door, and unkept cell), etc.;" and "Per collateral, I/P [inmate-patient] urinating on himself to stay warm. Psychosis, disorganization, unkempt, urinating inappropriately. … Highly malodorous outside of cell. Flies. Thick bundle of blankets outside of cell to seep up urine. Pool of urine inside of cell in between toilet and door. … I/P presented w/ disorganization, nonlinear TP [thought process], irrelevant responses, delusional TC [thought content]."

56.    According to Dr. Stewart's declaration submitted in the *Dunsmore* matter, "[t]hese observations show that Mr. Dean remained psychotic over an extended period." He continued, "[t]his behavior should have indicated that Mr. Dean required augmented psychiatric treatment, i.e., a change or increase in his medication regimen and/or transfer to a higher level of care, yet he was never again seen by a psychiatric practitioner who could have made that medication adjustment or ordered the transfer to a more therapeutic environment or the Emergency Department of a hospital. The County's failure to follow up in the

face of obvious symptoms of psychosis is a shocking departure from the standard of care."

57.    Due to the lack of meaningful psychiatric treatment, Mr. Dean continued to decompensate and act bizarre.

58.    The medical records indicate that another chart review was conducted by Defendant Rogers on June 26, 2025, due to a report that Mr. Dean was intentionally urinating on himself to "stay warm." Questionably, Defendant Rogers determined there was no safety concern. Despite her prior knowledge of Mr. Dean, and his obvious signs of decompensation, and medication failure, Defendant Rogers took no action, made no referrals for treatment or housing, and failed to have Mr. Dean evaluated on an urgent basis or sent out to a higher level of care.

59.    On June 26, 2025, Mr. Dean was assessed again by Defendant Alto. Defendant Alto references her prior findings from the June 22, 2025, assessment. She further determined Mr. Dean was still "psychotic, disorganized, unkempt, and urinating inappropriately." Defendant Alto noted that Mr. Dean was urinating on himself to stay warm but does not ask follow-up questions on this subject. She also notes that Mr. Dean was prescribed Zyprexa yet is still presenting acutely psychotic with worsening symptoms. Despite this, Defendant Alto terminated the assessment without a plan for further treatment. She simply ordered Mr. Dean to return to the clinic in one week.

60.    Defendant Alto did refer Mr. Dean to Outpatient Step Down Program ("OPSD"). OPSD is a stepdown mental health unit for inmates that do not meet the criteria for the PSU. However, there was no availability in OSDP. Defendant Alto failed to recommend other psychiatric housing options, or increased monitoring or counselling. Defendant Alto left Mr. Dean in general population housing despite determining that Mr. Dean required a higher level of care.

COMPLAINT

61.    Later that night, a housing deputy contacted Defendant Halsey Menendez, a mental health clinician, for a "status update on [Mr. Dean] due to reports of severe mental illness with bizarre behavior." The housing deputy reported that Mr. Dean was "at risk of injury from other inmates due to his bizarre behavior." Defendant Menendez reviewed Mr. Dean's medical chart including the recent mental health assessments. Despite noting that Mr. Dean was psychotic and displaying worsening symptoms and decompensation, and the housing deputy's fear of Mr. Dean's safety, Defendant Menedez took no action, made no referrals for treatment or housing, and failed to have Mr. Dean evaluated on an urgent basis or transferred to a higher level of care.

62.    As a result of Mr. Dean's bizarre behavior in general population housing, and without a housing order from the mental health staff, DOE housing/classification deputies transferred Mr. Dean to Ad-Sep on June 28, 2025. Based on information and belief, DOE deputies housed Mr. Dean in Ad-Sep as retaliation for his psychotic behavior. There was no medical directive to house Mr. Dean in Ad-Sep.

63.    According to the statements of percipient witnesses, over the course of two weeks while Mr. Dean was housed in Ad-Sep, Mr. Dean screamed, cried, and pled for help daily. He yelled that he needed medical attention and that he had a fever and was vomiting. Mr. Dean would urinate on himself to keep warm. He pushed the intercom button asking for help yet each plea went ignored. He continued to flood his cell in an attempt to gain the attention of deputies and medical staff. In response, staff placed suicide blankets at the base of his cell door to prevent the blackwater from seeping inside the module. Ad-Sep DOE deputies intentionally kept Mr. Dean in a contaminated cell, covered in urine and feces, and only permitted him to shower once in two weeks.

64.    Inmate Miguel Angel Lopez Altamirano, had been housed in Ad-Sep since February of 2025. He submitted a declaration regarding Mr. Dean's

18
COMPLAINT

treatment in the *Dunsmore* class action. Altamirano said that he could see inside Mr. Dean's cell, and it was clear that he was sick. According to Altamirano, "Mr. Dean would spend his days screaming and yelling," Altamirano said, "For the first couple weeks he was in the unit, his yelling was mostly unintelligible."

65. According to Inmate Altamirano, Mr. Dean's behavior grew increasingly severe. "He would rub feces on his face and into his beard. He would eat his own feces," Altamirano said. "He did this throughout his time in Unit E/4 [Ad-Sep]." Altamirano said no one came to Mr. Dean's assistance.

66. Jesse Gonzalez was another inmate housed in Ad-Sep that submitted a declaration in the *Dunsmore* matter regarding Mr. Dean's treatment. Gonzalez stated that Mr. Dean would constantly yell and complain that he did not feel well. He would bang on the cell door and table trying to get the deputies attention. According to Gonzalez, "Mr. Dean did this day and night, but the deputies ignored him. He often complained he was vomiting." Gonzalez asked Mr. Dean why he was making so much noise. Mr. Dean told Gonzalez that he had never done that before but that he did not feel well and needed help.

67. According to Inmate Gonzalez, Mr. Dean was "constantly soaked in feces and urine." Gonzalez stated, "it appeared he would soak his blanket in toilet water and lay in it." Gonzalez asked Mr. Dean why he was doing that. Mr. Dean responded that he had a fever and it made him feel better.

68. On June 30, 2025, the Superior Court in Mr. Dean's criminal case suspended all criminal hearings under Penal Code 1368 and ordered a competency evaluation.

69. On July 1, 2025, a medical notation was included in Mr. Dean's medical chart documenting the June 30, 2025, court order and classifying Mr. Dean as a "PC 1368."

70. On July 3, July 8, and July 10, 2025, Mr. Dean was assessed by mental health clinician, Defendant Jasmine Angel. Defendant Angel reviewed Mr.

19
COMPLAINT

Dean's medical chart and noted that he required assistance with 1) comprehension, 2) self-care, 3) communication, and 4) social skills. Defendant Angel also acknowledged Mr. Dean was awaiting a competency hearing and awaiting placement in OPSD. She independently assessed Mr. Dean and determined he was psychotic, delusional, disheveled, withdrawn, and semi-medication compliant. Defendant Angel noted it was difficult to assess Mr. Dean because his participation was limited.

71.     Despite determining that Mr. Dean was psychotic, gravely disabled, non-compliant with medication, and decompensating further in Ad-Sep, Defendant Angel did not order counseling or schedule a priority follow-up assessment. Defendant Angel did not order an urgent psychiatric evaluation to determine if Mr. Dean needed an adjustment to the anti-psychotic medication, nor did Defendant Angel order that Mr. Dean be housed in psychiatric housing that would provide constant monitoring and treatment options despite his recent transfer to Ad-Sep. Most egregiously, Defendant Angel failed to consider whether Ad-Sep was contraindicated due to Mr. Dean's clinical presentation. Stated plainly, Defendant Angel took no action, made no referrals, and failed to have Mr. Dean evaluated on an urgent basis for medication management or speciality housing.

72.     Mr. Dean continued to decompensate further in Ad-Sep.

73.     According to Inmate Gonzalez, "overtime, Mr. Dean's yelling became desperate. In the days leading up to July 13, 2025, he started yelling specifically for help. He also started crying. But jail staff continued to ignore him."

74.     On July 10, 2025, Inmate Altamirano approached Mr. Dean because he had been yelling for help for over a week. Altamirano asked Mr. Dean if he needed help, and Mr. Dean responded, "yes." Altamirano went back to his cell and pushed the intercom button. He advised DOE housing deputies that Mr. Dean

needed medical help. According to Altamirano, DOE housing deputies acknowledged that they heard Altamirano but did not check on Mr. Dean.

75.    According to Inmate Gonzalez, on or around July 11, 2025, "I asked deputies to check on Mr. Dean. Later that day, deputies pulled Mr. Dean out of his cell for the first time since he arrived in E/4 [Ad-Sep]. He had been left in his cell for at least a week by that point. When the deputies removed Mr. Dean from his cell, trusty workers pulled out a flood of brown water mixed with food and trash. It appeared it had built up overtime after the deputies had blocked Mr. Dean's door with a blanket. The trusty workers replaced some of the dirty items in his cell, bu[t] they left a filthy mattress covered in wet brown matter. Mr. Dean was given access to a shower fir the first time, after which he sat in the middle of the day room shivering. He appeared panicked."

76.    The following day, July 12, 2025, the day before Mr. Dean's death, he screamed and cried all day stating he could not see and wasn't feeling well. According to Inmate Gonzalez, Mr. Dean pushed the intercom bottom throughout the day. Each plea for help went ignored. Even pleas from other inmates were ignored.

77.    Inmate Raymond Molina, who was also jailed near Mr. Dean, similarly submitted a declaration in the *Dunsmore* lawsuit.  In his declaration, Molina stated that Mr. Dean spent most of his last day alive crying out for help with no response. Molina stated, "It was sad to hear a grown man in the jail yelling and crying constantly," "It sounded like he was in pain and needed help."

78.    According to Molina, "at no point during that day did any San Diego County jail staff attempt to help Mr. Dean."

79.    According to Inmate Gonzalez, that day, when medical staff administered medication, Mr. Dean told either Defendant nurse Baccelia *or* Defendant nurse Emekoba that he wasn't feeling well and that he could not see.

Defendant Baccelia/Emekoba heard Mr. Dean but did not provide or summon medical care.

80.     Hours later, at approximately 3:00 am on July 13, 2025, Deputies discovered Mr. Dean dead. Based on the level of rigor mortis present, Mr. Dean had been dead for hours before they discovered him. According to witnesses, Mr. Dean's body was blue and stiff. Mr. Dean's lower body was on the bunk and his upper body was hanging off the bunk. His arms were spread out, and his head was touching the floor. Deputies dragged Mr. Dean's body, which was lying on top of a feces and urine covered mattress, into the module. Mr. Dean was pronounced dead soon thereafter. Deputies left his body on the soiled mattress in the module for hours, forcing other inmates to eat breakfast while staring at Mr. Dean's dead body and soiled mattress.

81.     Disturbingly, as detailed below, the County has been on actual notice for nearly a decade that its practice of housing inmates with serious mental illnesses in solitary confinement is unconstitutional and directly results in preventable deaths.

**B. The County Knew Inmates with Serious Mental Illness Were Deteriorating and Suffering While Housed in Solitary Confinement.**

82.     Correctional mental health experts universally advise that inmates with serious mental illness housed in solitary confinement are vulnerable to deterioration and decompensation of their mental health condition. Placing such individuals in isolation intensifies their symptoms and puts them at substantial risk of psychosis and further decompensation.

83.     People with serious mental illness—a mental, behavioral or emotional disorder (such as schizophrenia, bipolar disorder, and major depressive disorder) resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities—are especially and profoundly vulnerable to these risks. Mr. Dean was this type of individual.

84.    By way of Grand Jury reports, watchdog group reports, the NCCHC report, the State Auditor's report, and at least half-a-dozen lawsuits, including the *Dunsmore* class action case, the County of San Diego, Naphcare, and CHP were acutely aware of the risks of housing seriously mentally ill inmates in solitary confinement. However, by policy and practice, the County, Naphcare, and CHP routinely confine people with serious mental illnesses in solitary confinement. In fact, the County, Naphcare, and CHP, houses inmates with serious mental illness in solitary confinement _because_ of their mental illness.

85.    In April 2018, Disability Rights California (DRC) issued a report to the San Diego County Sheriff's Department. It criticized the Sheriff's Department's practice of placing severely mentally ill patients in administrative segregation.  It noted the medical literature had extensively documented the adverse effects of segregation on psychiatric patients.

86.    That same year, in 2018, the San Diego Office of County Counsel retained Lindsey Hayes, a correctional consultant, to independently assess practices at the county jails. In a report issued in 2018, Hayes repeatedly warned the Sheriff's Department about the adverse effects of administrative segregation on seriously ill inmates.  "Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement," Hayes recommended that medical personnel first review an inmate's medical records to determine whether administrative segregation was contraindicated. Moreover, Hayes urged safety checks of individuals in administrative segregation every 30-minutes. The Sheriff's Department did not adopt Mr. Hayes' recommendations.

87.    Both the American Psychiatric Association ("APA") and the American Public Health Association ("APHA") warn that solitary confinement of people with mental illness creates a risk for psychiatric conditions to "deteriorate" and can "exacerbat[e]" psychiatric illness and associated symptoms. The United

Nations Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment states that solitary confinement "often results in severe exacerbation of a previously existing mental condition." The World Medical Association observes that people with serious mental illnes "may find isolation unbearable and suffer considerable health harms," and that "[s]olitary confinement may complicate treating such individuals and their associated health problems successfully later in the prison environment or when they are released back into the community."

88.   Corrections professionals agree that solitary confinement harms people, especially those with mental illness. The National Commission on Correctional Health Care ("NCCHC") issued a position statement observing that "[p]rolonged greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health." Ex. EE-298. The NCCHC observes that "[i]t is well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement,"

89.   The primary standards-setting organizations for jails and prisons in the United States—including the NCCHC, the American Correctional Association ("ACA"), and the U.S. Department of Justice ("DOJ")—have called for a prohibition on the use of solitary confinement for people with SMI, or, at a minimum, to limit its use to a last resort under extraordinary circumstances, and only under strict controls with enhanced monitoring and significant out-of-cell time. The NCCHC advises that people with mental illness "should be excluded from solitary confinement of any duration." The ACA—the oldest association for correctional practitioners—"[s]trongly discourage[s] agencies from placing offenders with [SMI] . . . in extended restrictive housing, unless there is an immediate and present danger to others or the safety of the institution." The DOJ advises that "[g]enerally, inmates with [SMI] … should not be placed in" solitary confinement.

24
COMPLAINT

90.     State regulations, specifically Title 15, section 1065, mandates jails to have "policies and procedures for a minimum of 10 hours of out of cell time distributed over a period of seven days to include: (1) an opportunity for three hours of exercise, and (2) an opportunity for seven hours of recreation." Cal. Code Regs. tit. 15, § 1065. According to Dr. Stewart, "The Ad-Sep units in San Diego 'do not come close to complying with California state law regulations.'" People in Ad-Sep typically receive, at most, one hour of out-of-cell time per day. In some Ad-Sep units, people receive less than one hour of out of cell time every other day. A former Jail mental health clinician testified in the *Dunsmore* matter that "[p]eople placed in Ad-Se[p] units are confined to their cells close to 24 hours per day and have limited social interactions with other people." Here, based on declarations from two inmates, Mr. Dean spent at least a week in a Ad-Sep cell without being removed or offered tier time or shower time.

91.     Despite their awareness that administrative segregation was NOT the appropriate housing placement for people like Mr. Dean, the County, Naphcare, and CHP personnel placed Mr. Dean in the very housing setting where they knew he was most likely to decompensate and suffer harm.

**C. The County Failed to Provide Adequate Mental Health Care to Inmates with Serious Mental Illness in Ad-Sep.**

92.     Per the County's policy, the County does not require a Qualified Mental Health Professional ("QMHP") to assess whether Ad-Sep housing is contraindicated due to mental health status.

93.     By policy, a QMHP is required to monitor and assess seriously mentally ill ("SMI") people in Ad-Sep only once per week. Pursuant to the same policy, nursing staff, who are not QMHPs, conduct "a mental health follow-up three days each week." In practice, the vast majority of these QMHP, non-QMHP, and "wellness check" contacts in Ad-Sep are quick, cell-front conversations with Sheriff's deputies present, consisting of a few cursory questions about how the

person is feeling and sleeping. Meaning, the information obtained from these checks is unreliable, as patients cannot communicate openly in non-confidential settings where law enforcement officers and other incarcerated people can hear what is being discussed.

94.   County policy allows people with SMI to remain in Ad-Sep, even when they are decompensating. There is *no* requirement that staff (1) notify health care providers of a patient's declining health, (2) ensure that the decompensating patient receives necessary medical and/or mental health care, or (3) transfer the patient to another unit (or hospital) where an appropriate level of care is available.

95.   Even if a health care staff member recommends that a person be removed from Ad-Sep, there is no requirement to ensure or effectuate a transfer as correctional staff have the ultimate decision-making authority regarding housing placements.

96.   By policy, the County does not follow the common and standards-based practice of conducting safety checks at least every 30 minutes at irregular intervals, which can save lives in solitary confinement settings; instead, Defendants conduct safety checks in Ad-Sep units only once every 60 minutes— the same interval as general population housing. According to Dr. Stewart, "Conducting safety checks in [Ad-Sep] only hourly constitutes an unacceptable failure to implement an established safeguard to address the significant danger that people, especially people with mental illness, face in those units."

97.   According to Dr. Stewart, "Defendants' policies 'are wholly inadequate to protect individuals with [Serious Mental Illness] from the harms of solitary confinement.'"

///

///

///

**D. The County's Policy and Practice of Housing Inmates with Serious Mental Illness in Ad-Sep has Resulted in Prior Preventable Deaths that put the County on Actual Notice of its Deliberate Indifference to Inmates with Serious Mental Illness Housed in Ad-Sep.**

98.    Mr. Dean's death is not the only preventable death resulting from the County's deliberate indifference to inmates with serious mental illness. Each inmate below died in Ad-Sep, with minimal, or practically meaningless psychiatric intervention. These SMI inmates plead for help only to be ignored by Ad-Sep housing deputies.

99.    **Lonnie Rupard**, who died in March 2022, was placed in Ad-Sep despite clear clinical contraindication due to serious mental illness and a need for a higher level of care. He was neglected in Ad-Sep until he lost over one-third of his body weight and starved to death. The County's own medical examiner ruled Mr. Rupard's death a "homicide," concluding that he died of pneumonia, malnutrition, and dehydration because his schizophrenia was neglected in Ad-Sep. Mr. Rupard had successfully been treated with medications in the past; however, he did not receive any psychiatric medications for the three months in the Jail leading to his death. Rupard asked several Ad-Sep housing deputies to summon medical care. Each request went ignored.

100.    **Roselee Bartolacci**, who was developmentally disabled and had schizoaffective disorder, was placed in Ad-Sep after being deemed "uncooperative" by jail staff. Records from one hospital visit describe Roselee as covered in feces and urine. The second time she was admitted, she was suffering from acute renal failure, malnutrition, sepsis and several other ailments. Custody staff left Roselee in her cell crying and moaning and sucking her thumb, speaking in gibberish and sitting in her own urine—again ignoring her pleas for medical assistance.

101.    **Matthew Settles**, who died by suicide in July 2022, was denied minimally adequate treatment of his psychosis in Ad-Sep where he had become

socially withdrawn, disheveled and disorganized, had poor hygiene, demonstrated impaired judgment, repeatedly refused medications, and would not leave his cell. Despite knowing Settles was under a conservatorship, the county failed to reach out to the County public conservator and failed to involuntarily medicate Settles. He suffered in isolation until he took his own life despite pleas for help by himself and other inmates.

102.  **Jonathan McDowell**, who experienced depression, insomnia, auditory hallucinations, and hopelessness, further deteriorated in Ad-Sep, and had received no psychiatric follow up despite refusing medications at least 40 times between June 2, 2023 and July 19, 2023, the day he was found hanging in his Ad-Sep cell.

103.  **Lester Marroquin**, a man with an extensive history of suicidality, died of acute water intoxication by drowning himself in his Ad-Sep toilet in May 2021. His mental health clinician testified that there were "deadly consequences" of placing people in Ad-Sep without clinical input from mental health staff and that she was "not consulted about whether it was clinically safe for [Mr. Marroquin] to be returned to Ad-Se[p] following his removal from psychiatric observation." Marroquin's pleas for medical attention also went ignored by Ad-Sep housing deputies.

# V. CAUSES OF ACTION

## A. FIRST CAUSE OF ACTION

**Pretrial Detainee's Claim re Conditions of Confinement and/or Medical Care (42 U.S.C. §1983)**
**[By Estate of Corey Dean, against Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30]**

104.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

105. Corey Dean was a pretrial detainee who was in the midst of competency proceedings under Penal Code § 1368 at the time of his death.

106. As set forth in the preceding paragraphs, individual defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30 failed to properly treat, monitor and house Mr. Dean based on his serious mental illness despite having access to Mr. Dean's medical information, which established the following: Mr. Dean suffered from schizoaffective disorder; met the criteria for gravely disabled, was psychotic and decompensating further despite being prescribed an anti-psychotic.

107. Each individual Defendant and medical DOE Defendant knew Mr. Dean required assistance with 1) comprehension, 2) self-care, 3) communication, and 4) social skills. Each Defendant also knew Mr. Dean was awaiting a competency hearing and awaiting placement in OPSD. Each Defendant also knew Mr. Dean was psychotic, delusional, disheveled, and withdrawn. Despite determining that Mr. Dean was psychotic, gravely disabled, non-compliant with medication, and decompensating further in Ad-Sep, Defendants did not order counseling or schedule a priority follow-up assessment. Defendants did not order an urgent psychiatric evaluation to determine if Mr. Dean needed an adjustment to the anti-psychotic medication, nor did Defendant Angel order that Mr. Dean be housed in psychiatric housing that would provide constant monitoring and treatment options. Most egregiously, each Defendant failed to consider whether Ad-Sep was contraindicated due to Mr. Dean's clinical presentation. Stated plainly, each medical Defendant took no action, made no referrals, and failed to have Mr. Dean evaluated on an urgent basis for medication management or speciality housing. Most egregiously, each medical Defendant knew Ad-Sep was the worst housing placement for Mr. Dean and knew that isolation would cause Mr. Dean to further decompensate and deteriorate.

29
COMPLAINT

108.  As for Defendant Baccelia *or* Emekoba, one of them was advised by Mr. Dean, during medication administration, hours before he died, that he was not feeling well, vomiting, and could not see. Either Defendant Baccelia *or* Emekoba ignored Mr. Dean's plea for help and intentionally failed to provide or summon medical care.

109.  Defendant DOES 1-19 were housing deputies assigned to Ad-Sep House E at VDF from June 28, 2025 through July 13, 2025. These DOES Defendant knew Mr. Dean required medical assistance. They observed Mr. Dean in obvious medical distress but intentionally ignored Mr. Dean and created an even more dangerous situation for Mr. Dean by sealing him in the contained Ad-Sep cell for weeks without meaningful social contact or basic human needs, such as a shower.

110.  Defendant DOES 1-19 were on direct notice, via Mr. Dena or other inmates housed in House E, that Mr. Dean was in acute medical distress and needed medical care. Each Defendant ignored these requests for medical assistance.

111.  Defendant DOE 20 was the classification deputy responsible for housing Mr. Dean in Ad-Sep on or around June 28, 2025. This Defendant was on notice that the unconstitutional practice of housing inmate's with serious mental illness in Ad-Sep did not align with correctional healthcare standards and was directly resulting in preventable deaths. Defendant 20 intentionally housed Mr. Dean in Ad-Sep as a punishment for his bizarre and psychotic behavior knowing that Ad-Seg would cause Mr. Dean to further decompensate, risking severe injury or death.

112.  DOE 21 is the charge nurse that was advised of Mr. Dean's worsening symptoms and further decompensation on July 3, 2025. DOE charge nurse reviewed Mr. Dean's medical chart and was acutely aware of his clinical presentation and worsening symptoms. DOE charge nurse knew that Mr. Dean

needed to be housed in psychiatric housing and equally had the ability to refer such housing placement. DOE charge nurse also knew that Mr. Dean's assessments indicated he was gravely disabled and, per County policy, was required to be placed in psychiatric housing. Despite this knowledge, DOE charge nurse failed to act entirely.

113.   DOE 22 was the psychiatric provider that was responsible for performing the required psychiatric follow-up during the first week of July 2025. DOE 22 was responsible for conducting the assessment as scheduled and to ensure that Mr. Dean's medication management was adequate and effective. DOE 22 intentionally decided not reassess Mr. Dean despite knowing that he was psychotic, gravely disabled, and rapidly decompensating in Ad-Sep.

114.   DOES 23-24 were other medical providers that were responsible for Mr. Dean's medical and mental health care and were acutely familiar with Mr. Dean's clinical presentation and treatment needs. DOES 23-24 were responsible for ensuring that Mr. Dean received meaningful mental health treatment, medication management, and a proper housing placement. DOES 23-24 was responsible for ensuring Mr. Dean was urgently assessed or sent out to a higher level of care. Similar to the other individual medical providers named above, DOES 23-24 failed to adequately assess, treat, monitor, medicate, and house Mr. Dean.

115.   Each Defendant knew, or should have known, that Mr. Dean should have never been placed in Ad-Sep. These Defendants knew, or should have known, that Mr. Dean required placement in the PSU and mandatory medication and treatment, even if he refused. As a direct consequence of these failures, Mr. Dean's serious medical condition was ignored by jail staff. Thus, Mr. Dean was not properly medicated, treated, or monitored.

116.   Furthermore, DOE Defendants 1-19 were responsible for performing safety checks in House E on June 28, 2025, through July 13, 2025. Each Defendant

violated Mr. Dean's constitutional rights when they performed deficient and untimely safety checks. It is also more likely than not that Defendants were a moving force in Mr. Dean's death because had they performed the safety check timely and adequately, Defendants would/should have summoned medical care to avoid Mr. Dean's further decompensation and death.

117.   As a direct and proximate result of Defendants' deliberate indifference to Mr. Dean's serious medical condition, and Mr. Dean's conditions of confinement, he experienced physical pain, severe emotional distress, and mental anguish, as well as the loss of his life and other damages as alleged herein.

118.   The conduct alleged herein caused Mr. Dean to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and caused Mr. Dean to suffer emotional distress, pain and suffering and death and further damages all in an amount to be shown according to proof at the time of trial.

119.   The conduct as alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights, justifying the award of exemplary damages against defendants in an amount to be shown according to proof at the time of trial to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.

120.   Plaintiff is also entitled to an award of attorney fees and costs of suit.

## B. SECOND CAUSE OF ACTION

### Right of Association (42 U.S.C. § 1983)

**[By Carolyn Dean and Michael Dean, in their own right, against Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30]**

121.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

32
COMPLAINT

122. As set forth in the preceding paragraphs, individual defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30 failed to properly treat, monitor and house Mr. Dean based on his serious mental illness despite having access to Mr. Dean's medical information, which established the following: Mr. Dean suffered from schizoaffective disorder; met the criteria for gravely disabled, was psychotic and decompensating further despite being prescribed an anti-psychotic.

123. Each individual Defendant and medical DOE Defendant knew Mr. Dean required assistance with 1) comprehension, 2) self-care, 3) communication, and 4) social skills. Each Defendant also knew Mr. Dean was awaiting a competency hearing and awaiting placement in OPSD. Each Defendant also knew Mr. Dean was psychotic, delusional, disheveled, and withdrawn. Despite determining that Mr. Dean was psychotic, gravely disabled, non-compliant with medication, and decompensating further in Ad-Sep, Defendants did not order counseling or schedule a priority follow-up assessment. Defendants did not order an urgent psychiatric evaluation to determine if Mr. Dean needed an adjustment to the anti-psychotic medication, nor did Defendant Angel order that Mr. Dean be housed in psychiatric housing that would provide constant monitoring and treatment options. Most egregiously, each Defendant failed to consider whether Ad-Sep was contraindicated due to Mr. Dean's clinical presentation. Stated plainly, each medical Defendant took no action, made no referrals, and failed to have Mr. Dean evaluated on an urgent basis for medication management or speciality housing. Most egregiously, each medical Defendant knew Ad-Sep was the worst housing placement for Mr. Dean and knew that isolation would cause Mr. Dean to further decompensate and deteriorate.

124. As for Defendant Baccelia *or* Emekoba, one of them was advised by Mr. Dean, during medication administration, hours before he died, that he was not

feeling well, vomiting, and could not see. Either Defendant Baccelia *or* Emekoba ignored Mr. Dean's plea for help and intentionally failed to provide or summon medical care.

125.  Defendant DOES 1-19 were housing deputies assigned to Ad-Sep House E at VDF from June 28, 2025 through July 13, 2025. These DOES Defendant knew Mr. Dean required medical assistance. They observed Mr. Dean in obvious medical distress but intentionally ignored Mr. Dean and created an even more dangerous situation for Mr. Dean by sealing him in the contained Ad-Sep cell for weeks without meaningful social contact or basic human needs, such as a shower.

126.  Defendant DOES 1-19 were on direct notice, via Mr. Dena or other inmates housed in House E, that Mr. Dean was in acute medical distress and needed medical care. Each Defendant ignored these requests for medical assistance.

127.  Defendant DOE 20 was the classification deputy responsible for housing Mr. Dean in Ad-Sep on or around June 28, 2025. This Defendant was on notice that the unconstitutional practice of housing inmate's with serious mental illness in Ad-Sep did not align with correctional healthcare standards and was directly resulting in preventable deaths. Defendant 20 intentionally housed Mr. Dean in Ad-Sep as a punishment for his bizarre and psychotic behavior knowing that Ad-Seg would cause Mr. Dean to further decompensate, risking severe injury or death.

128.  DOE 21 is the charge nurse that was advised of Mr. Dean's worsening symptoms and further decompensation on July 3, 2025. DOE charge nurse reviewed Mr. Dean's medical chart and was acutely aware of his clinical presentation and worsening symptoms. DOE charge nurse knew that Mr. Dean needed to be housed in psychiatric housing and equally had the ability to refer such housing placement. DOE charge nurse also knew that Mr. Dean's

34
COMPLAINT

assessments indicated he was gravely disabled and, per County policy, was required to be placed in psychiatric housing. Despite this knowledge, DOE charge nurse failed to act entirely.

129.   DOE 22 was the psychiatric provider that was responsible for performing the required psychiatric follow-up during the first week of July 2025. DOE 22 was responsible for conducting the assessment as scheduled and to ensure that Mr. Dean's medication management was adequate and effective. DOE 22 intentionally decided not reassess Mr. Dean despite knowing that he was psychotic, gravely disabled, and rapidly decompensating in Ad-Sep.

130.   DOES 23-24 were other medical providers that were responsible for Mr. Dean's medical and mental health care and were acutely familiar with Mr. Dean's clinical presentation and treatment needs. DOES 23-24 were responsible for ensuring that Mr. Dean received meaningful mental health treatment, medication management, and a proper housing placement. DOES 23-24 was responsible for ensuring Mr. Dean was urgently assessed or sent out to a higher level of care. Similar to the other individual medical providers named above, DOES 23-24 failed to adequately assess, treat, monitor, medicate, and house Mr. Dean.

131.   Each Defendant knew, or should have known, that Mr. Dean should have never been placed in Ad-Sep. These Defendants knew, or should have known, that Mr. Dean required placement in the PSU and mandatory medication and treatment, even if he refused. As a direct consequence of these failures, Mr. Dean's serious medical condition was ignored by jail staff. Thus, Mr. Dean was not properly medicated, treated, or monitored.

132.   Furthermore, DOE Defendants 1-19 were responsible for performing safety checks in House E on June 28, 2025, through July 13, 2025. Each Defendant violated Mr. Dean's constitutional rights when they performed deficient and untimely safety checks. It is also more likely than not that Defendants were a

moving force in Mr. Dean's death because had they performed the safety check timely and adequately, Defendants would/should have summoned medical care to avoid Mr. Dean's further decompensation and death.

133.   As a direct and proximate result of Defendants' deliberate indifference to Mr. Dean's serious medical condition, and Mr. Dean's conditions of confinement, he experienced physical pain, severe emotional distress, and mental anguish, as well as the loss of his life and other damages as alleged herein.

134.   Each Defendant caused the untimely, preventable, and wrongful death of Mr. Dean and deprived Plaintiffs Carolyn and Michael Dean of their liberty interest in their relationship with their son, in violation of their substantive due process rights as defined by the Fourteenth Amendment to the United States Constitution.

135.   There was no legitimate penological interest in failing to medicate, treat, monitor, and house Mr. Dean.

136.   There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in severe and obvious medical danger and distress.  There was no legitimate reason for refusing to place Mr. Dean in PSU or any other suitable psychiatric housing unit.  There was no legitimate reason for placing Mr. Dean in Ad-Sep for such a prolonged period.

137.   There was no legitimate penological interest in failing to perform timely and adequate safety cell checks.

138.   The deprivation of the rights alleged above has destroyed the constitutional rights of Carolyn and Michael Dean to the society and companionship of their son which is protected by the substantive due process clause of the Fourteenth Amendment.

139.   The conduct alleged herein violated Plaintiffs' rights as alleged above, thereby legally, proximately, foreseeably and causing Plaintiffs to suffer damages all to be shown in an amount according to proof at the time of trial.

## C. THIRD CAUSE OF ACTION

### *Monell* Municipal Liability Civil Rights Action (42 U.S.C. § 1983)
### [By All Plaintiffs against Defendant County of San Diego]

140.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

141.   The constitutional violations suffered by Plaintiffs as alleged in the prior paragraphs of this complaint were the actual and proximate result of certain de facto "policies", practices, and customs maintained by the County of San Diego, including policies of omission or inaction, which are described as follows:

   a.   The custom or practice of deficient screening and identification of mental health issues at intake. *See* ¶¶ 152-162.

   b.   The custom and practice of isolating severely mentally ill inmates in solitary confinement. *See* ¶¶ 163-185.

   c.   A *de facto* policy, practice, and custom of failing to properly train, supervise, and discipline Department personnel working in the County jails. *See* ¶¶187-193.

142.   Allegations of deliberate indifference and previous similar incidents giving the County notice of the above-referenced deficiencies, are specified and detailed in paragraph 186.

143.   External audits and reports by correctional experts have repeatedly warned the San Diego County Sheriff's Department of pervasive system-wide failures in the provision of healthcare causing an inordinately high rate of inmate death.

144. On November 8, 2016, the San Diego Sheriff's Department sought to obtain accreditation with the National Commission on Correctional Health Care (NCCHC). The Sheriff's Department authorized the NCCHC to conduct an audit of its health delivery system to determine whether the Sheriff's Department met the compliance standards for NCCHC accreditation.

145. In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails. Both the Central Jail and George Bailey failed to meet all "essential" compliance standards.

146. In 2015, Disability Rights California (DRC) opened an investigation into conditions at County jails In April 2018, DRC published its finding: "Suicides in San Diego County Jail: A System Failing People with Mental Illness." DRC experts identified twenty-four "Key Deficiencies" and provided forty-six recommendations to address deficiencies in the County's suicide-prevention and related mental health treatment delivery efforts.

147. In February 2022, the California State Auditor issued a report after conducting an audit of 815 deaths in San Diego County jails. Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. . . .These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody."

148. The State Auditor continued, "[t]he high rate of deaths in San Diego County's jails (as) compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices."

149. The audit said the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services and concluded that lack of attention may have contributed to their deaths.

38
COMPLAINT

150.  The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

151.  State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years. "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes," the report said.

152.  **The custom and practice of deficient screening and identification of mental health issues at intake**. The San Diego County Sheriff's Department maintained a custom and practice of inadequately screening incoming inmates for mental health issues during the intake process, making it difficult for seriously mentally ill inmates like Corey Dean to obtain appropriate care and treatment.

153.  The intake process at San Diego County jails only screens individuals to identify suicidality. There is no mental health professional who conducts any intake or assessment of incoming inmates to identify serious psychiatric illness and mental health needs. The intake nurse will only refer a person to a secondary assessment by a mental health clinician when the intake nurse identifies a potential risk of suicide. The mental health clinician's only responsibility is to then assess for placement in housing for individuals at risk of suicide.

154.  The San Diego County Sheriff's Department does not utilize a mental health "gatekeeper" responsible for: (1) identifying an incoming inmate's serious mental health needs; (2) referring that person to a psychiatrist to be prescribed psychiatric medication; and (3) referring that person to a mental health clinician for development of a treatment plan.

155.  In its January 2017 report, the NCCHC noted that the San Diego County Sheriff's Department did not meet all compliance standard for mental

health screening and evaluation. Specifically, the NCCHC noted there was no policy requiring mental health screening by qualified mental health professionals within 14 days of admission to the jail. The Sheriff's Department did not require inmate-patients to be asked all necessary mental health history and status questions. There was no log or tracking process to ensure mental health patients were being seen by mental health professionals.

156.  The NCCHC further noted that there not enough mental health professionals employed at the Central Jail to provide necessary services. "It is recommended that the facility increase the number of mental health professionals to a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate."

157.  The NCCHC recommended that nursing staff who were conducting mental health screenings during the intake process "be provided with training to ensure mental health needs are being identified appropriately."

158.  In its report dated February 3, 2022, the State Auditor of California recommended the Sheriff's Department "[r]evise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them."

159.  San Diego County, unlike other counties, does not have a coordinated county health system. There is no policy or practice of intake nurses reviewing medical and mental health history from the County's own health system. There is no policy or practice requiring intake nurses to review previous mental health records that reside in the County's own system. Intake nurses only rely on individuals to self-report their mental health history.

COMPLAINT

160. In its February 2022 report, the State Auditor recommended the Sheriff's Department "[c]reate a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process."

161. The failure to maintain constitutionally adequate screening and intake processes for serious mental health issues caused harm to Corey Dean. Mr. Dean had a long history of psychiatric illness that was documented in his medical chart maintained by the San Diego County Sheriff's Department. Yet, no one contacted Mr. Dean's previous psychiatric providers to ensure any current treatment and medication regimens were continued. No one scheduled Corey to be seen immediately by a psychiatrist to establish a treatment and medication plan. No one assessed Corey's mental health acuity level to determine appropriate treatment and housing. The absence of any screening of Corey's mental health needs resulted in his placement in general population where Corey deteriorated.

162. The County's custom and practice of deficient intake and screening caused Corey Dean to be deprived of psychiatric care for one week until Mr. Dean was assessed by NP Kimberly Miller. But this was the only psychiatric evaluation Mr. Dean ever received by a higher level provider until his death.

163. **The custom and practice of isolating severely mentally ill inmates in solitary confinement**. San Diego County maintained widespread and pervasive practice of placing seriously ill psychiatric patients like Corey Dean in administrative segregation solely due to the severity of their mental illness.

164. In January 2017, the NCCHC advised the San Diego County Sheriff's Department of serious deficiencies in the treatment of mentally ill inmates by placing them in administrative segregation. **The NCCHC reported that "security or classification staff members are placing inmates in segregation because they are mentally ill, not due to disciplinary infractions, which violates NCCHC standards."** (Emphasis added.)

41
COMPLAINT

165.  The NCCHC noted it was problematic that mental health staff were not "screening or reviewing inmates for contraindications to segregation prior to their placement in that unit."

166.  Moreover, the NCCHC noted that inmates in segregation required regular monitoring by health staff to determine if the inmate was deteriorating while in isolation. Although a nurse checked inmates in administrative segregation three times a week, there were "no notes as to their condition or if they are having a problem coping with isolation." The NCCHC recommended that health staff use a standardized form for each inmate in segregation, documenting the inmate's condition, which should then be "scanned into the electronic health record."

167.  The NCCHC further indicated that inmates in segregation had limited contact with staff or other inmates. The NCCHC standard considers this "extreme isolation" and requires the individual to be monitored daily by medical staff and at least once a week by mental health staff. This did not occur for Corey Dean.

168.  In April 2018, Disability Rights California (DRC) issued an investigative report regarding San Diego County Jails entitled, *Suicides in San Diego County Jail A System Failing People With Mental Illness*. DRC's report criticized the use of restrictive housing for mentally ill inmates.  DRC, based on the review and recommendations of its expert witnesses, wrote as follows:

> The placement of inmates, particularly those with mental health needs, in segregated or restrictive housing increases the risk of suicidal and self-harming behavior, isolates individuals, and impedes normal interpersonal interactions that are essential to psychological health and adequate treatment. **At least six (6) inmates who died by suicide in the last four years were housed in designated solitary confinement units in San Diego County Jail, and several more were housed in units with solitary confinement conditions**.
>
> The experts found that San Diego County Jail lacks an adequate process to screen inmates for increased suicide

risk prior to and during placement in solitary confinement. This means that jail staff may be placing inmates who are at greatest risk of suicide in solitary confinement without identifying and considering those risks.

(Emphasis added.)

169. DRC issued three specific recommendations related to the use of administrative segregation under the heading of "Improve Mental Health Treatment, End the Harmful Use of Solitary Confinement"

**Recommendation 15**. Reduce the use of solitary confinement segregation housing, and take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances.

**Recommendation 16**. Track and analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates – particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.

**Recommendation 17**. Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four (4) hours per day of out-of-cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.

170. The Sheriff's Department responded to those specific recommendations as follows in a letter dated April 24, 2018 that was signed by then-Sheriff Gore. In response to DRC Recommendation 15, the letter stated the "Sheriff's Department acknowledges that the use of solitary confinement is an issue currently being discussed nationally across many types of correctional facilities. The Sheriff's Department has been proactive in reducing the number of administrative segregated housing placements. . . . Licensed Mental Health

Clinicians conduct and document weekly administrative segregation wellness checks to monitor and intervene in case of decompensation. The Clinicians also communicate weekly with the Jail Population Management Unit to share their impressions and concerns about inmates in segregated housing who have mental health needs."[3]

171.   In response to DRC Recommendation 16, the letter stated the "Sheriff's Department agrees that tracking and analyzing data with segregation is helpful to reduce unnecessary segregation placements and is currently working to that end." In response to DRC Recommendation 17, the letter stated, the "Sheriffs Department acknowledges that segregation can have adverse effects on inmates in prolonged isolation. The Sheriff's Department has taken proactive efforts to improve isolation conditions in restrictive housing units."

172.   In April 2018, the San Diego Office of County Counsel also hired Lindsey Hayes, a nationally recognized expert on suicide prevention in correctional systems, to independently assess suicide prevention practices at the county jails.

173.   On June 22, 2018, Mr. Hayes issued a report entitled, *Report on Suicide Prevention Practices Within the San Diego County Jail System*. Hayes echoed DRC's advice to the Sheriff's Department and warned the Department about the adverse effects of administrative segregation on seriously ill inmates. Hayes gave the following recommendation regarding administrative segregation:

---

[3] The declarations of Dr. Evans and Jennifer Alonso in the *Dunsmore* class action filed on May 2022, described *infra* at ¶¶ 177-183, demonstrate these promised reforms did not occur. Dr. Evans stated in her declaration, "Throughout my time working as Medical Director and later as Chief Psychiatrist, I was not aware of any defined policy or procedure or reliable system whereby clinical assessment or input from mental health staff was regularly sought prior to or at the time of placement in Administrative Segregation . . . . As a general matter, at the San Diego County Jail, mental health staff's input was not sought or meaningfully considered."

44
COMPLAINT

13) Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, it is strongly recommended that medical personnel review the medical section of JIMS to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement. The following are recommended questions for the brief assessment:

- Are you currently having thoughts of harming yourself?
- Have you previously tried to harm yourself because of a segregation placement?
- Is the inmate speaking incoherently; expressing bizarre thoughts; unable to sit still or pay attention; or is disoriented to time, place, or person?

Affirmative responses to any of these questions should result in an Emergent mental health referral.

174.  In response to this recommendation (Recommendation 13), the Sheriff's Department wrote, "Business processes are being developed, and policies are being updated, to provide for real time notification to Qualified Mental Health Providers so assessments can be accomplished in a timely manner."

175.  Hayes further urged regular and frequent checks of individuals in administrative segregation because of the likelihood of suicide resulting from administrative segregation: "(28) Given the strong association between inmate suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that DSB officials give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals."

176.  In response to this recommendation, the Sheriff's Department stated it "has given strong consideration to increasing deputy rounds of restricted

housing units from 60 minutes to 30 minute intervals. However, given the challenges regarding the physical layout of jail facilities, the number of inmates, and care necessary to properly conduct these checks, the Department has determined that it would not be feasible at this time to make this change."

177. On May 2, 2022, in the class action matter of *Darryl Dunsmore et al. v. San Diego County Sheriff's Department et al.*, Southern District of California case no. 20-cv-00406-AJB-DDL, the class-action plaintiffs submitted the declaration of Christine Evans, M.D., in support of the motion for a preliminary injunction and provisional class certification. Dr. Evans was formerly the Medical Director and Chief Psychiatrist at San Diego County Jails, responsible for overseeing the provision of mental health care to inmates in county jails.

178. Dr. Evans discussed the alarming custom and practice at San Diego County jails of placing severely mentally ill patients in solitary confinement:

> I can recall several instances where mental health staff members and I raised concerns to custody staff about our patients being placed in Administrative Segregation housing (or Administrative Segregation "overflow"), or on a "Lockdown" or "Bypass" status that was essentially Administrative Segregation solitary confinement conditions – that is, no programming, minimal human contact, and little to no out-of-cell time at all.

> Custody staff working within the Jail facilities were generally unreceptive to clinicians' recommendations about Segregation housing placements for our patients. When I could, as the Medical Director, I would raise concerns directly with custody leadership, who sometimes would work to address the clinical concern. But this process was not possible in all cases. In all, I saw many people being placed into Administrative Segregation when clinicians knew and made known that such a placement would be harmful.

46
COMPLAINT

Decl. Christine Evans, M.D. at ¶ ¶ 19-20, dkt. no. 119-10 in case no. 20-cv-00406-AJB-DDL (emphasis added).

179.  Dr. Evans further explained:

> I have kept in touch with mental health staff members who have continued to work at the Jail since my departure last year. I understand that there has been little to no meaningful change in this area. People with mental illness continue to be placed in solitary confinement-type Administrative Segregation housing without input from mental health staff. Mental health staff continue to feel powerless to protect their patients who are placed at risk of decompensation and even suicide in Administrative Segregation housing.
>
> . . .
>
> I participated in several post-mortem death reviews regarding in-custody deaths, including suicides. I recall multiple cases in which the individual either died or was seriously injured while attempting suicide in Administrative Segregation.

*Id*. at ¶¶ 23, 25.

180.  In the *Dunsmore* class action, plaintiffs also submitted the sworn declaration of Jennifer Alonso, a licensed clinical social worker who worked for three years as a mental health clinician at the San Diego County Jail (from April 2019 to April 2022). She stated: "One of the most serious concerns I have for my patients is that custody staff are, by policy and practice, able to overrule mental health clinicians about where a patient is housed and how they are treated. This happens on a consistent basis at the Jail." Ms. Alonso noted that medical leadership at the Jail "report to the Sheriff's Command staff, meaning that the custody staff have final say on the mental health policy decisions and individual patient decisions."

181.  Ms. Alonso further described the practice of correctional officers placing mentally ill inmates in ad-seg without clinical input:

Patients with mental illness are frequently placed in Administrative Segregation ("Ad-Seg") units, which are basically a form of solitary confinement that is supposed to address safety and security issues. (Jail leadership recently began to call these units "Administrative Separation" or "Ad-Sep." But there were no substantive changes to conditions that went along with this name change.) People placed in Ad-Seg units are confined to their cells close to 24 hours per day and have limited social interactions with other people. Some people are housed in Ad-Seg "overflow" units because so many people are placed in the designated Ad-Seg units. Still other people are placed on "Lockdown" or "Bypass" status in their general population housing unit, meaning they are subjected to "Ad-Seg"-type conditions. I have observed that solitary confinement exacerbates some of my patients' mental health symptoms, and many of my patients are psychologically and physically harmed in this extremely isolating setting.

While some people in custody at the Jail do pose a danger to others based on aggressive behavior that requires that they be housed separately, many people with mental illness have been placed in Ad-Seg even when I and other clinicians determined that they could be housed safely in a non-Segregation unit (like OPSD), including with an individualized treatment or behavioral health plan. I have seen many people with mental illness deteriorate in the Ad-Seg units (some of which are located near the OPSD units where I am assigned).

A few years ago, the Jail system's mental health co-coordinator (who hired me to work in the OPSD units) made a specific recommendation to the Sheriff's Department to stop putting people with mental illness in the solitary confinement-type Ad-Seg units, given the risks to their psychological and physical well-being there. My understanding is that the Sheriff's Department Command staff refused to implement this recommendation.

48
COMPLAINT

> As mental health clinicians in San Diego County's jails, it was made very clear to us that we have no role in determining the housing placement for our patients, even when we know that a placement (like Ad-Seg or "Lockdown" or "Bypass") will put a particular patient at risk of harm, including suicide.

182. Dr. Stewart noted in his Rule 26 expert report in *Dunsmore* that he "observed a deeply disturbing trend of people with serious mental illness being placed in Administrative Separation at a disproportionately high rate with devasting effects on their mental health, safety, and well-being." He wrote that "mental health and custody staff all understand – and *expect* – that people with serious mental illness will be placed – and *remain* – in these solitary confinement-type units." (Emphasis in original.)

183. Jennifer Alonso and Dr. Christine Evans described the routine practice of housing seriously mentally ill inmates in administrative segregation without regard to their mental health needs. When mental health clinicians attempted to intervene or request their patients be removed from administrative segregation, custody officials refused.

184. Dr. Stewart opined that one of the major deficiencies in San Diego County's police is that custody staff are given sole authority regarding placement of people in Administrative Segregation. Dr. Stewart stated this policy and practice was "'inconsistent with NCCHC and other modern correctional mental health standards in ways that put patients at substantial risk of serious harm.'"

185. The County's decision to place Corey Dean in solitary confinement for being mentally ill foreseeably caused him to deteriorate due to neglect. Custody staff ignored Mr. Dean's pleas for medical assistance and ignored the requests of neighboring inmates who sought to summon medical care for Mr. Dean.

///
///

186. **Deliberate indifference: San Diego County evidenced deliberate indifference to inmates' serious psychiatric needs because it knew that seriously mentally ill inmates were dying at San Diego jails due to neglect**. The San Diego County Sheriff's Department was aware that neglecting the serious mental health needs of inmates was causing preventable deaths. The following individuals died in the custody of the San Diego Sheriff's Department due to serious mental illness that was recognized by jail staff but not properly treated within County jails:

a. In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had smeared blood on the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling. Deputies had failed to conduct proper cell checks to check for his wellbeing despite Mr. Carroll's known condition.

b. In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to continue treatment and monitoring for a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez at the Central Jail failed to read his medical records from Patton to recognize that he was on a pre-existing treatment plan.

c. In 2016, Heron Moriarty was arrested after having a psychotic break. Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to communicate his condition and failed to provide him psychiatric care. On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself. In August 2020, a whistleblower within the Sheriff's Department, Jeanette Werner, came forward to

COMPLAINT

describe Mr. Moriarty's "howls" which filled the jail and sounded "like a wounded animal crying out for help." Werner confronted a sergeant, Weidenthaler, who refused to place Moriarty in a safety cell. When Werner persisted, insisting she could quickly prepare the necessary paperwork to place Moriarty in a safety cell, the sergeant ordered her to "stand down." That evening, Mr. Moriarty used two t-shirts to choke himself. Later, Weidenthaler instructed Werner not to tell anyone about their conversation.

d. In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in jail, the evening before he was scheduled to see a psychiatrist. His psychiatric condition was well known to the Jail staff, who ignored it. Ms. Werner told a county investigator that county officials had altered documents in this case.

e. In February 2018, Paul Silva died in Central Jail after deputies pepper sprayed, tased, and beat Paul to death in his cell. The Central Jail staff knew Paul suffered from schizophrenia as it was well documented in the Jail's database system. Law enforcement encountered Paul after his mother requested Paul be hospitalized because he refused to take his schizophrenia medication. Paul decompensated as he stayed in temporary holding cells with little food, no blankets, no bed, and with constant light and noise for almost 36 hours. The staff failed to communicate Paul's critical medical condition and failed to monitor him. After he went without food, sleep, and any medication, Paul began acting bizarrely. He could not comprehend deputies' commands and questions. Deputies killed Paul Silva after they entered his jail cell in an attempt to remove him from his jail cell.

f.  In 2019, Ivan Ortiz died by suicide in San Diego Central Jail. Mr. Ortiz had previously told staff he was feeling suicidal, and he had at least one documental suicide attempt while in County custody. The County of San Diego's Citizen Law Enforcement Review Board concluded that "staff failed to keep a suicidal inmate safe from self-harm and the conduct was not justified." A deputy failed to remove an object that could be used for self-harm in Mr. Ortiz's cell, and Mr. Ortiz used the object to hang himself.

g.  In November 2019, Matthew Godfrey, who suffered from serious mental illness, died in a filthy administrative segregation cell at the Central Jail. He was found with torn clothing around his neck and rope in his pants.

h.  In May 2020, Joseph Morton committed suicide after being placed in the isolation cell for five days at the Vista Detention Facility.

i.  In 2021, Lester Daniel Marroquin died by suicide hours after being transferred to an administrative-segregation cell in San Diego Central Jail.  Previously, the Sheriff's Department repeatedly refused to produce Mr. Marroquin for his court-ordered psych evaluations.  Marroquin cycled in and out of administrative segregation and safety cells for months, as his mental health seemed to worsen. He attempted to end his own life twice in April 2021 and experienced hallucinations that made him believe he could talk to his mother through the toilet in his cell and uncontrollably drink water from the toilet bowl.  On May 30, 2021, Marroquin was again transferred to an administrative

segregation cell, where he began drinking water from the cell's toilet and died from water intoxication.

j.  In March 2022, Lonnie Rupard died in San Diego Central Jail while in administrative segregation.  From the time Mr. Rupard was taken into custody until his death, he suffered a 60-pound weight loss, or 36% of total body weight.  Mr. Rupard's cell was covered in trash and feces, and jail staff failed to intervene and assess Mr. Rupard's medical needs.  Rupard continuously refused prescription medications which were ultimately canceled due to his repeated refusals.  Medical staff repeatedly postponed Mr. Rupard's care due to time constraints or for Mr. Rupard's refusal. Mr. Rupard's cause of death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia.

k.  In July 2022, Matthew Settles committed suicide while in administrative segregation. Matthew was a seriously mentally ill inmate with a lengthy history of intensive psychiatric treatment. Despite knowing Mr. Settles was under a permanent conservatorship, the Sheriff's Department failed to reach out to the County public conservator and failed to involuntarily medicate Settles. He suffered in isolation until he took his own life.

l.  In July 2023, Jonathan McDowell took his own life while housed in administrative segregation. Mr. McDowell experienced depression, insomnia, auditory hallucinations, and hopelessness. He further deteriorated in Ad-Seg, and had received no psychiatric follow up despite refusing medications at least 40

COMPLAINT

times between June 2, 2023 and July 19, 2023, the day he was found hanging in his Ad-Seg cell.

187. **Collective inaction**. The County is further liable because the cumulative and persistent failures and misdeeds of the entire Sheriff's Department at the Central Jail caused the ultimate injury and harm suffered by decedent Corey Dean. Plaintiffs' constitutional deprivations were not only caused by the conduct of individual officers, but also resulted from the collective inaction of the San Diego County Sheriff's Department.  Plaintiffs' constitutional deprivations were further caused by the subordinates' adherence to customs and practices as alleged herein. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *see also Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

188. For years leading up to the death of Corey Dean, the County's final policymakers were on notice of the foregoing "policies and practices" including the fact that these "policies and practices" were (and are) causing a disproportionate number of deaths and injuries to people in County jails.  By failing to implement any reasonable policy changes in response to this crisis, the County has remained deliberately indifferent to the constitutional rights of people in the County's care and custody.

189.  If the County is going to take into its custody individuals with serious health issues, the County must provide them with adequate care.  The County has, however, consistently failed to provide adequate training, supervision, and resources for its jail staff.

190. Despite the frequency with which Sheriff's Department personnel must work with individuals suffering from mental health issues, for example, jail staff know little if anything about mental healthcare.  As such, jail staff frequently leave such individuals unattended, unmonitored, and—even worse—in dangerous situations with obviously dire consequences.

191. The County's final policymakers failed, in summary, to provide adequate training, supervision, and resources necessary for jail staff to perform their duties without violating the constitutional rights of, not only the people in the County's care and custody, but these individuals' spouses, children, and parents, as well.

192. Even after the County's final policymakers were provided with official reports from multiple oversight organizations, notifying them of the dangerous conditions in County jails, policymakers failed to give jail staff the training, supervision, and resources needed to address the problems raised by these oversight organizations.

193. As set forth in the preceding paragraphs of Plaintiff's complaint, which are incorporated herein by reference, Defendant County knew of these unconstitutional practices and customs inflicting grievous injury to vulnerable inmates. The County tolerated constitutionally deficient customs and practices of its subordinates related to the care of seriously ill inmates. Defendant County of San Diego and each of its subordinates were deliberately indifferent to the serious mental health needs of Corey Dean. These systemic failures and unconstitutional practices were the moving force behind the misconduct of the deputies, the denial of medical care to Corey Dean, inflicting prolonged pain and suffering to Corey, causing his death, and depriving Carolyn Dean and Michael Dean of the care, comfort, society, and companionship of their son.

### D. FOURTH CAUSE OF ACTION

**(Violation of the Americans with Disability Act of 1990**
**42 U.S.C. 12101, *et seq*.)**
**[By the Estate of Corey Dean, against the County of San Diego]**

194. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

195. As detailed above, Mr. Dean met the criteria of a gravely disabled person whose major life activity was substantially limited by his schizoaffective disorder. As such, Mr. Dean was a qualified individual under the ADA.

196. Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

197. "A disability discrimination claim may be based on 'one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation.'" *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021). A plaintiff need not allege disparate treatment or disparate impact to state a reasonable accommodation claim. *Id*.

198. **Reasonable accommodation theory of ADA liability**. Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination based on disability. The ADA sets an affirmative requirement to act appropriately with respect to prisoners with disabilities. The County of San Diego are subject to Title II of the ADA.

199. ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation." Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

200. Under a "reasonable accommodation" theory of ADA liability, the plaintiff does not need to show that a comparison class of non-disabled individuals was treated differently. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003).

201. Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental or physical

health.   These accommodations include training on specialized training of jail staff, heightened level of medical care, and diligent surveillance.

202.  To safely enjoy the benefits of safe housing, access to adequate psychiatric treatment and housing, access to the outdoors and recreational activities, access to phone calls with families, the benefit of reading material and writing instruments, and access to activities and programming provided to all inmates, Mr. Dean required an accommodation – immediate placement in the PSU or another psychiatric housing unit.  Each Defendant failed to make that reasonable accommodation for Mr. Dean.  Instead, Defendants placed (or failed to remove) Mr. Dean from Ad-Sep.  That, in turn, caused Mr. Dean to be deprived of access and contact with his family and case manager.  Mr. Dean could not call his family to speak with his mother, father, or sister.  Mr. Dean could not access reading material or other educational material to occupy himself.  Mr. Dean could not access outdoor space, sunshine, and fresh air.  He could not enjoy human contact and companionship.  Instead, he deteriorated in isolation, deprived of contact with the support system and denied basic coping mechanisms (walking, reading, and learning.)

203.  Plaintiff can also establish intentional discrimination because each Defendant acted with deliberate indifference. *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016). Meaning, because the County knew that Mr. Dean required PSU or psychiatric placement, and maintained a policy and practice of housing inmate's with serious mental illness in Ad-Sep, the County purposefully deprived Mr. Dean of a reasonable accommodation. Each individual Defendant's failure to affirmatively place Mr. Dean in psychiatric hosuing, or remove him from isolation housing causing further decompensation, knowing such inaction would cause harm, acted with deliberate indifference.

204.  **Disparate impact theory of ADA liability**. In a disparate impact theory of ADA liability, a plaintiff may demonstrate a facially neutral practice or

policy applied to different groups but disproportionately, and more harshly, impacted one particular group. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). Under a disparate impact theory of liability, there need not be evidence of subjective intent to discriminate, which is required in a "disparate treatment" case. *Id*. In the context of a Title II ADA claim, "[t]o assert a disparate impact claim, a plaintiff must allege that a facially neutral government policy or practice has the 'effect of denying meaningful access to public services' to people with disabilities." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021).

205.   In this case, the County's Ad-Sep policy and practice disproportionately impacts severely mentally ill inmates like Mr. Dean. Although the County's Ad-Sep policy is facially neutral and applies to all groups of inmates within the jails, the policy has an excessively burdensome impact on severely mentally ill inmates who decompensate while in isolation. Mr. Dean was disproportionately burdened by the extreme conditions of isolation in Ad-Sep.

206.   Mr. Dean was denied the benefits of the services, programs, or activities of the County jails which other inmates could access. He did not have contact with other people. He was not allowed exercise time or the ability to walk in the recreation yard, to see the sky or bask in the sun. Mr. Dean was deprived of time in the "dayroom" to move about freely and socialize with his cohorts. Mr. Dean could not have human contact with mental health clinicians or nurses within Ad-Sep as all visits had to occur cellside. He could not attend group counseling or therapy because all individuals had to be placed in separate cages.

207.   Additionally, the County's Ad-Sep practice disproportionately impacts severely mentally ill inmates like Mr. Dean because the policy had no mechanism for removal. Placement in administrative segregation for disciplinary purposes is a limited sentence for a set period of time. In contrast, for seriously

mentally ill inmates like Mr. Dean, housing in administrative segregation was indefinite.

208. Furthermore, the County's Ad-Sep policy permits use of the dayroom in administrative segregation units for inmates who are deemed compatible or of the same classification. These inmates are permitted up to three hours of dayroom time per day. "A shared dayroom program can serve as a step towards a return to mainline or designated special housing," i.e., a transition to leaving Ad-Sep.

209. But severely mentally ill inmates were housed indefinitely in administrative segregation without plans to transition to other housing. The Ad-Sep unit at VDF that houses severely mentally ill inmates does not permit open use of the dayroom. As Dr. Stewart described in the *Dunsmore* matter, the dayroom for severely mentally ill inmates consists of another cage that is used by only one person at a time. In other words, while non-severely mentally ill inmates were permitted use of the dayroom, up to three hours, even when in Ad-Sep, severely ill inmates remained locked in their cells without socialization or human contact or the ability to move about freely in the dayroom.

210. As a direct and proximate result of the Defendant's conduct as herein described, Mr. Dean suffered in the amount to be determined at the time of trial.

### E. FIFTH CAUSE OF ACTION
### Violation of the Rehabilitation Act 29 U.S.C. § 794(a))
### [By the Estate of Corey Dean, against the County of San Diego]

211. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

212. The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

213.   Defendant County of San Diego is a program that receives federal financial assistance as defined in 29 U.S.C. § 794(b).

214.   Mr. Dean was a "qualified individual with a disability" under the Rehabilitation Act.

215.   Because Mr. Dean was severely mentally ill, he required an accommodation – immediate placement in the PSU or other psychiatric unit. Moreover, confinement in Ad-Sep disproportionately impacted Mr. Dean, as detailed above.

216.   Moreover, employees of Defendant County of San Diego were deliberately indifferent to Mr. Dean's serious medical condition. Defendants knew of the substantial risk of harm to Mr. Dean from his serious, diagnosed condition and they responded with deliberate indifference by isolating him in Ad-Sep and denying him contact with his support system, his family, and depriving him of all coping mechanisms, as alleged in the preceding paragraphs.

217.   As a direct and proximate result of the Defendants' conduct as herein described, Mr. Dean suffered in the amount to be determined at the time of trial

### F.  SIXTH CAUSE OF ACTION

**Violation of Cal. Civil Code § 52.1 (Bane Act) – Survival Claim
[By the Estate of Corey Dean against Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, San Diego County, Naphcare, CHP, and DOES 1-30]**

218.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

219.   Plaintiff Estate of Corey Dean brings the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civil Procedure, § 377.20 et. seq.

220. By their acts, omissions, customs, and policies, Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30 and County of San Diego, each Defendant acting in concert/conspiracy, as described above, by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Mr. Dean's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

a. The right to be free from objectively unreasonable treatment and deliberate indifference to Mr. Dean's serious medical needs while in custody as a pre-trial detainee, as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

b. Decedent's right to familial association as secured by the First and/or Fourteenth Amendments;

c. The right to enjoy and defend life and liberty; acquire, possess, and protect properly; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

d. The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

e. The right to emergency medical care as required by California Government Code § 845.6.

221. As alleged above, Defendants' violations of Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

222. All of Defendants' violations of duties and rights, and coercive conduct described herein were volitional acts; none was accidental or merely negligent.

223.   Further, each Defendant violated Decedent's rights with the specific intent and purpose to deprive Mr. Dean of his enjoyment of those rights and of the interests protected by those rights.  Each defendant acted with reckless disregard for Mr. Dean's rights.

224.   Defendant County of San Diego, Naphcare and CHP are vicariously liable for the violation of rights by their employees and agents.  Defendant County of San Diego is vicariously liable pursuant to California Government Code, § 815.2.

225.   The Estate of Corey Dean seeks compensatory damages for the harm Mr. Dean suffered before his death, including pain and suffering.  Recently amended Section 377.34, subdivision (b), of the California Code of Civil Procedure provides: "Notwithstanding subdivision (a), in an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable may include damages for pain, suffering, or disfigurement if the action or proceeding was granted a preference pursuant to Section 36 before January 1, 2022, or was filed on or after January 1, 2022, and before January 1, 2026."

226.   As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Decedent's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages.  Against each and every Defendant is entitled to relief as set forth above, including punitive damages against all individuals Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs, attorneys' fees, treble damages and civil penalties.

///
///
///
///

## G. SEVENTH CAUSE OF ACTION

**Negligence Survival Claim (CCP § 377.30)**
**[By the Estate of Corey Dean, against Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, San Diego County, Naphcare, CHP, and DOES 1-30]**

227.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

228.  The allegations against Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30 all employees or agents of the County of San Diego, Naphcare, or CHP, are made under Gov. Code § 844.6

229.  By their acts and omissions, as detailed above, Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30 failed to summon or provide adequate medical treatment, monitoring, medication, and housing, as detailed above. DOES 1-19 further failed to conduct adequate direct observation safety checks Mr. Dean while he was housed in Ad-Sep. These defendants failed to summon immediate medical care when Mr. Dean was begging for help and also failed to conduct timely safety checks in the hours leading up to his death. These Defendants improperly, negligently, wrongfully, and recklessly failed to treat, monitor, house and perform timely and adequate hourly checks pursuant to the Code of Regulations.

230.  Each Defendant identified above failed to properly treat Mr. Dean for his serious mental health needs and Plaintiff asserts a medical malpractice claim against these defendants. Defendants had a duty to Mr. Dean to act with ordinary care and prudence so as not to cause harm or injury to another. In evaluating, assessing and handling Mr. Dean's medical condition, Defendants failed to comply with professional and legal standards.

231.  Defendant NAPHCARE and CHP failed to properly train, supervise, and monitor its employees regarding the care of severely mentally ill inmates like Mr. Dean. NAPHCARE and CHP failed to establish and enforce adequate policies regarding the care and treatment of severely mentally ill inmates in Ad-Sep. NAPHCARE and CHP failed to establish and enforce adequate policies regarding assessment, monitoring, and housing of seriously mentally ill inmates in a correctional setting.

232.  By engaging in the acts alleged herein, each Defendant failed to act with ordinary care and breached their duty of care owed to Mr. Dean.

233.  Defendant County, NAPHCARE and CHP are vicariously responsible for the acts of its individual agents and employees, including DOE Defendants.

234.  By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to Mr. Dean.

235.  As a direct and proximate result of the Defendants' negligent conduct as herein described, Mr. Dean died.

236.  The Estate of Corey Dean seeks compensatory damages for the harm Mr. Dean suffered before his death, including pain and suffering.  Recently amended Section 377.34, subdivision (b), of the California Code of Civil Procedure provides: "Notwithstanding subdivision (a), in an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable may include damages for pain, suffering, or disfigurement if the action or proceeding was granted a preference pursuant to Section 36 before January 1, 2022, or was filed on or after January 1, 2022, and before January 1, 2026."

237.  Because Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, and DOES 1-30 were acting within the scope of their

employment, the County is also liable for the damages arising from their negligence. *See* Cal. Gov. Code § 815.2; *see also* Cal. Gov't Code § 844.6.

### H. EIGHTH CAUSE OF ACTION

**Wrongful Death (CCP § 377.60)**
**[By Carolyn Dean and Michael Dean, in their own right, against Defendants Pamela Mitchell-Rodgers, Angela Bueno, Hosanna Alto, Kimberly Miller, Halsey Menendez, Jasmine Angel, Misty Baccelia OR Sandra Emekoba, County of San Diego, Naphcare, CHP and DOES 1-30]**

238.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

239.  As set forth in the preceding paragraphs, Defendants committed wrongful acts which proximately caused the death of Mr. Dean.  Specifically, all Defendants, deprived Mr. Dean of his rights under the United States Constitution and California Constitution to adequate medical and mental health care and to safe conditions of confinement.  These acts resulted in the death of Mr. Dean.

240.  Because Defendants were acting within the scope of their employment by the Sheriff's Department, the County is also liable for the damages arising from their negligence. *See* Cal. Gov. Code § 815.2; *see also* Cal. Gov't Code § 844.6

241.  The wrongful acts alleged above has destroyed the relationship between Plaintiff Carolyn and Michael Dean and decedent Mr. Dean and has legally, proximately, foreseeably and caused severe non-economic damages, including the loss of society, companionship, care, and comfort, and further non-economic damages according to proof at the time of trial.

## VI.   PUNITIVE DAMAGES

The conduct of all individual defendants as alleged herein was malicious, oppressive, fraudulent, and in reckless disregard of decedent's federally guaranteed rights.  Plaintiffs seek punitive damages to punish and deter such conduct, as alleged in this complaint.

# VII.  PRAYER FOR RELIEF

Plaintiffs pray for judgment as follows:

1) For compensatory general and special damages in an amount in accordance with proof.
2) For punitive and exemplary damages as permitted by law.
3) For attorney's fees, expenses and costs of suit as permitted by law.
4) For any other relief that is just and proper.

# VIII. JURY TRIAL DEMAND

Pursuant to Rule 38 Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution, Plaintiffs demand a jury trial.


DATED: December 31, 2025          Respectfully submitted,


/s Grace Jun
Grace Jun, Esq.
Attorney for Plaintiffs Estate of Corey Dean, Carolyn Dean, and Michael Dean